**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ALBERT (AVRAHAM) SCHWARTZBERG,   )
                                         )
               Plaintiff,         )
                                         )
             v.                )      02: 06cv1006
                                         )
MELLON BANK, N.A.,              )
                                         )
              Defendant.      )

**MEMORANDUM OPINION AND ORDER OF COURT**

January 8, 2008

Presently before the Court are the following:

•      DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, with brief in support (*Document Nos. 14 and 15, respectively*) and the PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (*Document No. 21*); and

•      PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, with brief in support (*Document Nos. 16 and 17, respectively*), REPLY BRIEF IN OPPOSITION filed by Defendant (*Document No. 19*), and REPLY BRIEF TO DEFENDANT'S RESPONSE filed by Plaintiff (*Document No. 23*).

The issues have been fully briefed and the matter is ripe for disposition. After a careful consideration of the motions, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff, Albert (Avraham) Schwartzberg on his claims of religious discrimination and

retaliation. Therefore, the Court will grant the Defendant's motion for summary judgment in its entirety and deny the Plaintiff's Motion for Partial Summary Judgment.

## Procedural Background

Plaintiff, Albert (Avraham) Schwartzberg ("Plaintiff") brought this lawsuit on July 27, 2006, by the filing of a six-count Complaint against his former employer, Mellon Bank, N.A. ("Mellon"), in which he asserted claims of religious and racial discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951, *et seq.*

By Order of Court dated August 7, 2007, the Court granted Plaintiff's Motion for Voluntary Withdrawal of Counts V and VI, the claims which alleged racial discrimination.

Plaintiff contends that Mellon unlawfully discriminated against him on the basis of his religion (Hasidic Jew) when it issued him disciplinary warnings and denied him a wage increase, and then retaliated against him when it terminated his employment after he opposed such alleged discrimination.

Defendant has filed the instant motion for summary judgment in which it contends that it is entitled to judgment as a matter of law because, *inter alia,* Plaintiff is unable to establish (i) a *prima facie* case of religious discrimination and (ii) a *prima facie* case of retaliation.

Plaintiff has filed the instant motion for partial summary judgment in which he contends that he is entitled to judgment as a matter of law on his claims of religious discrimination. Plaintiff does not seek summary judgment on his retaliation claims.

## BACKGROUND

As the law requires, all disputed facts and inferences are resolved most favorable to the Plaintiff.

Plaintiff was hired by Mellon in February 2002 as a Trust Operations Processor, a/k/a a Customer Relations Representative. He worked in a phone center and provided telephone-based customer service assistance to retirees who had questions or concerns about their pension benefits.

Plaintiff reported to Stephanie Fultz Wigenton, the Call Center Manager, who in turn reported to Demond Batie, the Unit Manager. Mr. Batie reported to Anthony Williamson, the Manager of the phone center and Manager of the Tax and Control department, who in turn reported to Marilyn Infante, the Manager of Benefits Disbursements.

Plaintiff, a practicing Orthodox Jew, was permitted to bring religious articles to work, including candles, was permitted to leave early on Fridays to observe the Sabbath, and was permitted to circumvent seniority for vacation scheduling purposes to allow him to observe any religious holidays.

Additionally, Mellon provided a number of accommodations to Plaintiff due to a visual impairment (Plaintiff is legally blind). He used a large closed circuit computer screen and special adaptive software that both magnified the text on his computer screen and allowed for voice activated typing.

3

Beginning in 2004, Mellon's Diversity Council permitted the creation of a number of affinity groups organized by Mellon employees for Mellon employees, *to wit*: HEART - the affinity network for people with disabilities; MORE - a multicultural affinity network; PRISM - the affinity network for gay, lesbian, bisexual and transgendered individuals; the Asian-American Affinity Network; and the Black/African-American Affinity Network. None of the affinity groups are exclusive and all Mellon employees are free to participate, or not, in the activities of any affinity group.

Plaintiff was a member of the HEART affinity network, which was co-chaired by Mellon employee Patricia Michaud.

On May 6, 2005, all Mellon Pittsburgh employees, including Plaintiff, received an interoffice email from the Mellon "Corporate Communications" Department in which all employees were invited to attend a luncheon hosted by the Parents, Families and Friends of Lesbians and Gays ("PFLAG") and Mellon's Gay, Lesbian, Bisexual and Transgender ("GLBT") affinity group, which is known as PRISM.[1]

_____

[1]     The May 6, 2005 email from Corporate Communications, read as follows:

"PRISM (Pride, Respect, Individuality and Support at Mellon), Mellon's Gay, Lesbian, Bisexual and Transgender (GLBT) affinity network, will host a lunch-and-learn session from noon to 1 p.m. Thursday, May 19, in room 1150 of Two Mellon center. The event will feature a panel discussion by representatives of Parents, Families and Friends of Lesbians and Gays (PFLAG) and PRISM, followed by a question-and-answer session.

PFLAG is a national support, education and advocacy organization of GLBT people, their families and friends. With 250,000 members and supports and local affiliates in more than 500 communities across the U.S. and abroad, PFLAG is the largest grassroots-based family organization of its kind.

(continued...)

On or about May 11, 2005, all members of the Pittsburgh HEART affinity group, including Plaintiff, received the following email from Ms. Michaud:

> Subject: PRISM Event
>
> HEART Members - Just a reminder of this upcoming event sponsored by the PRISM affinity network. Please try to support this if your schedule permits.
>
> Patti.

Ms. Michaud testified in her deposition that "[i]t was [her] standing operating practice as co-chair to send reminders of this nature to HEART members anytime any of the other affinity networks had an event that was open to the public." Michaud Depo. at 14-15.

On May 13, 20005, Plaintiff responded to Ms. Michaud's email with the following email of his own:

> To Patty:
>
> This may or [sic] not be politically correct, but I strongly resent trying to lump all the affinity groups together!
>
> People with disABILITIES have some real and often obvious challenges / problems. For i[n]stance, I use a closed TV to read printouts and have special adaptive software that will both enlarge and speak the computer screen.
>
> If you happen to be black or purple or green. etc. or happen to have this sickness called gay or lesbian, just do your job. It has bee[n] 40 years since the Civil Rights Act and I notice a number of blacks in managerial positions here at Mellon. What business is it to me what someone does in their bedroom? As Mrs. Bender told our group, we as disABLED persons should get to work early and take a shower before we come in, i.e., be the

---

¹(...continued)
Feel free to bring your lunch. Registration is not necessary. For more information on PRISM or Mellon's other affinity networks, click <<http://intra.mellonbankcom/dept/hr/diversity/affinity/index.html>>."

most valuable worker you can be without asking for sympathy or a handout. What is the purpose of these other affinity groups anyway but to ask for a "break" or gift or approval or . . .

Sincerely,
Abe Schwartzberg

Ms. Michaud, who is gay,[2] found Plaintiff's email offensive and alerted Colleen Connors in the Human Resources ("HR") department. Ms. Connors is the primary HR liaison for the affinity networks. Ms. Michaud testified that she believed the email showed a lack of respect for other individuals. In particular, Ms. Michaud explained to Ms. Conners that she "was very concerned about the allusion to the GLBT population having a sickness."

Ms. Connors referred the matter to Carl Melella, the Director of Employee Relations, who in turn showed the email to Marilyn Infante, Manager of Benefits Disbursements, and Lisa Peters, Director of Human Resources.

On May 18, 2005, Plaintiff was summoned to a meeting with Mr. Melella, Ms. Infante, and Mr. Williamson, the manager of the phone center. During the meeting, Mr. Melella explained to Plaintiff that in Pittsburgh "it's illegal for a large employer to discriminate against people on the basis of their sexual orientation" and that the policy of Mellon was "to try to create an environment where people can do their best work and are not subjected to any type of hostility or harassment." Melella Depo. at 23.

Plaintiff was told that his email reply to Ms. Michaud could be offensive to employees. Mr. Melella and Ms. Infante stated that they respected employees "personal opinions," but that Mellon required all employees to treat co-workers with respect. Plaintiff

---

[2]     Plaintiff testified at his deposition, however, that he did not know Ms. Michaud was a lesbian.

6

was provided with a copy of Mellon's corporate policy on "Sexual and Other Discriminatory Harassment" which forbids discriminatory harassment, defined in the policy as follows:

> [V]erbal or physical conduct that denigrates or shows hostility on the bases of race, color, religion, sex, age, national origin, marital or familial status, ancestry, citizenship, **sexual orientation,** gender identity, qualified disability, veteran or military status or other protected status when such conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile, humiliating or offensive work environment.

P's Exh. 15 (emphasis added).

The policy also offers the following as an example of discriminatory harassment: "Written or graphic materials that denigrates or shows hostility toward an individual or group." *Id.*

Plaintiff stated at the meeting that his opposition to same-sex relations was part of his religious beliefs. As a result of Plaintiff's conduct, Mr. Melella and Ms. Infante decided to issue a verbal warning to Plaintiff.

Following the meeting, Mr. Melella sent an email to Colleen Connors, which according to Mr. Melella accurately summarized the meeting with Plaintiff. The email states in relevant part:

> I further told him that all employees must be treated with respect, and that all employees must observe our policies. I covered sections CCP-504-2 (relating to discriminatory harassment), and explained with quotes from his e-mail how the policy forbids certain behaviors in the workplace.

> Marilyn Infante told Abe that she insists that all employees be treated with respect, and that failure to abide by this warning would result in further Corrective Action.. . .

Pl's Exh. 19.

On May 19, 2005, Plaintiff received the following email from Colleen Connors:

Our goal at Mellon is to create an inclusive work environment where all
employees can contribute to their fullest potential.  We also recognize
there are many ways in which diversity is represented.

Affinity Networks are formed by employees who share a common
characteristic.  It provides a forum where they can exchange ideas and
information about shared or common experiences.  Affinity Networks are
not about "gifts" or "breaks" or "handouts".  They serve a business
purpose by allowing for educational and developmental opportunities for
all interested employees.  In support of our inclusion goal, all employees
are welcome to join and participate in any network, however, no employee
need join or attend an event if they prefer not to do so.

The Affinity Networks at Mellon work together to sponsor and support
events and workshops for all members and all employees.  This joint effort
is another example of Mellon's Shared Value of Teamwork.

If you have any other questions, please feel free to contact me, your
Human Resources Business Partner or Employee Relations.

Pl's Ex. 10.

Plaintiff testified during his deposition that he understood from his meeting with Mr.

Melella, Ms. Infante, and Mr. Williamson that he was not to send messages of this kind in the

future.  Schwartzberg Depo. at 46.  However, on May 23, 2005, Plaintiff presented Ms. Infante

with a variety of written materials again denigrating the gay lifestyle.  Specifically, Plaintiff

showed Ms. Infante a pre-printed postcard.  The front of the postcard reads as follows:

**The Seven Universal Laws**

Believe in G-D, and Do Not Worship Idols

Honor G-D, and Don't Blaspheme His Name
Do Not Murder
Do Not Commit Adultery, Incest or
Other Forbidden Relations
Do Not Steal
Don't Eat Meat Taken From A Live Animal

8

The back of the post card included the following language:

> 4.     Value The Bond of Family.  Honor the divinity of marriage.  The loyalty, love and respect that are learned in a wholesome family translate into loyalty, love and respect in society.

Plaintiff also gave Ms. Infante a letter in which he explained that his opposition to homosexual and lesbian relations was religiously based.  The letter stated as follows:

> Dear Marylyn (sic):
>
> Per our conversation of a couple days ago, I would like to tell you there is a severe lack of knowledge in these matters.  Homosexuality and lesbian relations are definitely included in "Forbidden Relations." In the 7 Universal Laws given to Noah.
>
> I realize that this is a very sensitive topic that must be dealt with in a considerate fashion.  There is counseling available.  But just as the story of "The King Who Had No Clothes," there has to be an awareness that something is missing.  The True Friend of Gays and Lesbians is the one that points them for help.
>
> Someone can argue this back and forth if they want to, but let them argue with AIDS, etc.  The real BOSS is sending us a message!
>
> Sincerely,
>
> Albert A. Schwartzberg
>
> PS:  This has nothing to do with philosophy.

Pl's Exh. 21.

Ms. Infante testified that she viewed Plaintiff's May 23, 2005 letter as both a rejection of his prior warning and a violation of Mellon's Sexual and Other Discriminatory Harassment policy.  Infante Depo. at 37-40.  Mr. Melella testified that he viewed Plaintiff's

actions of May 23, 2005, "as a rejection of [his] pleas to [Plaintiff] that we need to treat people with respect." Melella Depo. at 35.

On May 24, 2005, Plaintiff was again summoned to meet with Ms. Infante, along with Mr. Melella and Mr. Batie. Plaintiff was told that his recent actions constituted proselytization and that this was a further violation of corporate policy. Plaintiff was told that he had two warnings against him and that his employment would be terminated if there were any additional violations of company policy.

Mr. Melella reported Plaintiff's conduct to his supervisor, Lisa Peters, the director of Mellon's HR Department. Ms. Peters told Mr. Melella to issue a written warning to Plaintiff based upon his most recent conduct.

Ms. Infante and Mr. Melella agreed that the written warning issued to Plaintiff should be a Final Written Warning. The Final Written Warning, states in part as follows:

> The letter on its face is a direct violation of the warning previously issued to Mr. Schwartzberg in the meeting of May 18. Further, the card simply violates that warning as well as constitutes proselytization in the workplace, a further violation of company policy.
>
> Your failure to correct this problem, or any other violation of Mellon policies or procedures, may result in further Corrective Action up to [sic] an including termination of your employment. This Corrective Action remains in effect for one year from today's date.

Pl's Exh. 25.

On or about June 14 or 15, 2005, Plaintiff's direct supervisor, Stephanie Wigenton, noticed that Plaintiff was not logged into his phone system. When she went to check on him, she observed that he was asleep. Ms. Wigenton reported this incident to her supervisor, Mr.

Batie.  Ms. Wigenton did not recommend any disciplinary action be taken against Plaintiff at that time.  Additionally, Mr. Batie did not discuss the incident with Plaintiff at that time.

On June 27, 2005, Plaintiff was summoned into Mr. Batie's office.  Present at that meeting were Batie and Stephanie Wigenton.  Plaintiff's managers informed him that because he was on Final Written Warning status, he would not be receiving a merit increase in accordance with Mellon's policy.[3]  Plaintiff's managers also informed him that there was a second reason he would not be receiving a raise, to wit:  Mellon was experiencing financial difficulties.

After the meeting, Plaintiff sent an email to Ms. Wigenton in which he inquired whether any employee on the phone team received a merit increase.  Mr. Wigenton responded that such information was "confidential" and forwarded a copy of Plaintiff's email to Mr. Batie, who in turn forwarded it to Mr. Williamson.

Plaintiff then sent a second email to Ms. Wigenton in which he requested the exact title and position of Ms. Infante.  Ms. Wigenton again forwarded this email to Mr. Batie, who forwarded it to Mr. Williamson.  The email was also forwarded to Mr. Melella.

On July 8, 2005, another Mellon employee, Cheryl Freas, noticed Plaintiff was asleep at his workstation when she went to gather some information to update the software Plaintiff needed to enlarge the text on his computer.  Ms. Freas reported the incident to Plaintiff's supervisor, Ms. Wigenton, who in turn, reported the incident to Mr. Batie.  Again, Ms. Wigenton did not recommend that Plaintiff receive discipline for this incident.

---

[3]     Under Mellon's "Managing Performance and Conduct Through Corrective Action" policy, salary increases "should be cancelled for employees who have received a final written warning of corrective action."  Pl's Exh. 60.

Five days later, on July 13, 2005, Ms. Wigenton again discovered that Plaintiff was "sound asleep" at his workstation. She advised Mr. Batie and both walked over to Plaintiff's cubicle and attempted to wake him. After several attempts to wake him, i.e., nudging and calling his name, Plaintiff awoke. Following this incident, Mr. Batie contacted Mr. Williamson and HR representative Terri Capristo about the sleeping incidents.

The next day, on July 14, 2005, a meeting was called with Plaintiff, Mr. Williamson, Mr. Batie, and two HR representatives - Terri Babich and Sandy Finigan. At the meeting, Mr. Williamson explained to Plaintiff that he had been observed sleeping on the job on three separate occasions since June 15, 2005, and asked Plaintiff for an explanation. Plaintiff replied that he needed "to get some more sleep at night." Pl's Exh. 5; Batie Depo. at 99.

Mr. Williamson then informed Plaintiff of the serious nature of his conduct and that given his Final Warning status, all subsequent violations of Mellon's policies could lead to termination. In fact, sleeping on the job is one of Mellon's "intolerable offenses," which is defined as conduct that is "so intolerable that the progressive corrective action process may be advanced to a final warning or termination without prior warnings."

After being told of the severity of his misconduct, Plaintiff replied that he did not believe that he was asleep, but rather was merely "resting his eyes." Pl's Exh. 5. Plaintiff was informed that management would need to discuss the ramifications of his misconduct and would get back to him. Plaintiff then told his managers that he had contacted the EEOC with regard to his prior discipline.[4] The record reflects that prior to this meeting, no one at Mellon

---

[4] The record reflects that Plaintiff completed the "EEOC General Information Questionnaire" on July 10, 2007 and it was stamped as being received by the EEOC
(continued...)

12

had known that Plaintiff had contacted the EEOC. At the close of the meeting, no decision was made with regard to the appropriate discipline or termination of Plaintiff's employment.

Subsequent to the meeting, Plaintiff sent an email to his supervisor, Mr. Batie, in which he explained the alleged sleep incident and again reported that he had gone to the EEOC concerning his two prior warnings, and that he had also gone to the EEOC concerning the denial of his pay raise. Pl's Ex. 28.

The following day, on July 15, 2005, Terri Babich and Sandy Finigan, met with their supervisor, Jan Nicholsen, to discuss what should be done about Plaintiff in light of his sleeping on the job. During the course of their meeting, Mr. Bruno Bonacchi, Ms. Infante's supervisor, Ms. Peters, Mr. Melella, and legal counsel were consulted about the decision.

At or around the same time as this meeting was occurring, Ms. Wigenton observed Plaintiff asleep again at his workstation and informed Mr. Batie. Ms. Wigenton and Mr. Batie walked over to Plaintiff's cubicle, both observed that the Plaintiff was leaned back in his chair and was asleep. Mr. Batie nudged Plaintiff once and called his name; Plaintiff then awoke. Mr. Batie immediately informed Mr. Williamson of Plaintiff's fourth sleeping occurrence.

During the course of the meeting between Mr. Nicholson, Ms. Babich and Ms. Finigan, Mr. Nicholson received word that Plaintiff had again been found sleeping on the job. It was immediately decided that Plaintiff's employment would be terminated that afternoon. Plaintiff was told that he had been caught sleeping at his desk, which was an intolerable

---

⁴(...continued)
on July 13, 2007. Pl's Exh. 26. In his answers to the Questionnaire, Plaintiff alleged that he was discriminated against because of his religious beliefs, by being denied a merit pay increase, and by being put on a one-year warning.

offense, and since he was on Final Written Warning, he was terminated effective immediately.

Plaintiff received a written termination notice which stated "Because your actions represent an

intolerable offence (sleeping on the job), and you are presently on final written warning of

corrective action for misconduct, your employment is terminated effectively immediately."  Pl's

Exh. 30. When asked why he would fall asleep on the job the day after he received a warning

from Mr. Williamson about sleeping on the job, Plaintiff replied, in part, "[g]ood question."

Schwartzberg Depo. at 88-89.

## STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c).  Thus, the Court's task is not to resolve disputed issues of

fact, but to determine whether there exist any factual issues to be tried.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).  The non-moving party must raise "more than a mere

scintilla of evidence in its favor" in order to overcome a summary judgment motion.  *Williams*

*v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S.

at 249).  Further, the non-moving party cannot rely on unsupported assertions, conclusory

allegations, or mere suspicions in attempting to survive a summary judgment motion.  *Id.*

(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Distilled to its essence, the

summary judgment standard requires the non-moving party to create a "sufficient disagreement

to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

With respect to summary judgment in discrimination cases, the Court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987). The task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory or retaliatory purpose. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 525 (3d Cir. 1992), *cert. denied*, 510 U.S. 826 (1993).

## DISCUSSION

A.      Religious Discrimination Claims Brought Under Title VII and the PHRA[5]

As stated above, Plaintiff claims that he was subjected to religious discrimination when Mellon issued him two disciplinary warnings and denied him a wage increase. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In order to establish a *prima facie* case of failure-to-accommodate religious discrimination, a plaintiff must show that (i) he held a sincere religious belief which conflicts with an employment requirement; (ii) that he has informed his employer of the conflict; and

_____

[5]      Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 104 (3d Cir. 1996). Therefore, the disposition of Plaintiff's Title VII claims apply with equal force to his PHRA discrimination claims.

(iii) that he was adversely affected for failing to comply with the conflicting employment requirement. *Shelton v. University of Med. & Dentistry*, 223 F.3d 220, 224 (3d Cir. 2000).

Once a *prima facie* case is established, the burden shifts to the employer to show that it reasonably accommodated the plaintiff, or to show that it could not have reasonably accommodated the plaintiff without undue hardship. *Getz v. Commonwealth of Pa., Dep't of Public Welfare*, 802 F.2d 72, 73 (3d Cir. 1986). Any reasonable accommodation is sufficient to meet an employer's obligation under Title VII, as long as it "eliminates the conflict between employment requirements and religious practices." *Ansonia Board of Educ. v. Philbrook*, 479 U.S. 60, 68-70 (1986). If the defendant is able to clear this relatively low hurdle, the presumption evaporates and the onus is again on the plaintiff, who bears the ultimate burden of showing, by a preponderance of the evidence, that the defendant's proffered reason(s) were a pretext for discrimination. *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 522 (3d Cir. 1992). The plaintiff can either prove this directly, by showing that discriminatory considerations motivated the defendant's actions, or indirectly, by showing that the rationale provided by the defendant is unworthy of credence. *Josey*, 996 F.2d at 638; *Weldon*, 896 F.2d at 797

The Court finds and rules that it is clear from the record that Plaintiff has failed to establish the threshold element of a *prima facie* case of failure-to-accommodate. The record is completely void of any evidence sufficient to raise an inference that Plaintiff held a sincere religious belief which conflicted with an employment requirement. Thus, summary judgment is appropriate in favor of Mellon.

Plaintiff states that he "is a practicing and observant Hasidic Jew and, in accordance with his religion, he has a firmly held belief that members of the same sex should not engage in sexual relations with each other." Complaint, ¶ 14. Plaintiff argues that Mellon "encouraged Mr. Schwartzberg and other employees of Defendant to support and condone homosexual activity" by having "an affinity group for homosexuals and encouraging employees to attend and support a 'lunch and learn' meeting of this affinity group . . ." Pl's Br. at 3, n.3.

Mellon is subject to Pittsburgh City Code, Chapter 659.02, a local ordinance, which prohibits discrimination on the basis of sexual orientation. Additionally, Mellon maintains a policy which prohibits "verbal or physical conduct that denigrates or shows hostility on the [basis] of sexual orientation," among other characteristics. (Facts, ¶¶ 33-34).

The record is completely void of any evidence which reflects that there was a <u>conflict</u> between Plaintiff's religious beliefs (homosexuality is immoral) and Mellon's employment requirements (conduct that denigrates or shows hostility on the basis of sexual orientation is prohibited).[6] Plaintiff does not allege, and the record does not establish, that Mellon required or even suggested that Plaintiff change his beliefs with regard to homosexuality or that he support or condone homosexuality. Rather, the record clearly reflects that Plaintiff was advised that he was entitled to his beliefs and that his participation in the PFLAG luncheon or other such activities was strictly <u>voluntary</u>. (*See* Facts, ¶¶ 30-31, 39, 45). *See generally Altman v. Minnesota Dept. of Corrections*, 251 F.3d 1199 (8th Cir. 2001) (grant of summary judgment to

---

[6] For the purpose of this Opinion only, and with considerable reservation, the Court finds that Plaintiff "holds a sincere religious belief that homosexual acts are prohibited and an abomination," and that such belief is not merely a "personal philosophy." Pl's Br. at 4 (Document No. 18).

employer reversed because employer made attendance at gay sensitivity training session mandatory); *Buonnano v. AT&T Broadband,* LLC, 313 F. Supp. 2d 1069 (D. Colo. 2004) (summary judgment denied to employer who required employees to sign an anti-discrimination policy which required employees to "value" the beliefs of employer and fellow co-workers).

Indeed, Plaintiff concedes that there is no "conflict between Defendant's policy and Plaintiff's beliefs." Rather, Plaintiff argues that "he has a right to express his religious beliefs in response to the e-mails and Infante's attack on his religious beliefs and that in such context there is a duty to accommodate."

To the contrary, it is elementary that an employer does not have a duty to accommodate unless the plaintiff establishes each and every element of his *prima facie* case. By its clear and unequivocal terms, the first element of a *prima facie* case of failure-to-accommodate requires that the plaintiff must establish that he held a sincere religious belief <u>which conflicts with an employment requirement</u>. *Shelton,* 223 F.3d at 224. By Plaintiff's own admission, no such conflict exists in this case. Plaintiff has offered no evidence that he was unlawfully subjected to an employment requirement that conflicted with his religious beliefs.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's claims of religious discrimination.

B.        *Retaliation Claims Brought Under Title VII and the PHRA*

Title VII provides, in pertinent part, as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*42 U.S.C. § 2000e-3(a).* To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: (i) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006). Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII. *Id.* at 341.

The summary judgment record is wholly undisputed that Plaintiff did not protest his prior discipline or the denial of a merit increase on grounds which implicate the anti-discrimination laws, nor did he reveal his contact with the EEOC, until <u>after</u> he had been repeatedly caught sleeping on the job and it was evident that his employment could be terminated. The record reflects that Plaintiff was terminated from his employment with Mellon because he was caught sleeping on the job just one (1) day after he had been warned that he could be terminated for such conduct.

Mellon has articulated non-discriminatory and non-retaliatory reasons for denying Plaintiff a merit increase (his being on Final Written Warning status) and for terminating his employment (his repeated instances of sleeping on the job). Therefore, to avoid summary judgment, Plaintiff must adduce evidence sufficient to prove that retaliation was the real reason that Mellon did not give him a merit increase and terminated his employment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000); *see also Billet v. CIGNA Corp.*,

940 F.2d 812, 816 (3d Cir. 1991) ("Merely reciting that [discrimination or retaliation] was the reason for the decision does not make it so.")

Plaintiff must prove pretext by pointing to specific record evidence from which a reasonable factfinder could (i) disbelieve Mellon's articulated non-discriminatory, non-retaliatory reasons; or (ii) otherwise believe that an invidious discriminatory reason (i.e., religious animus and/or retaliatory motive) was more likely than not a motivating or determinative cause of Plaintiff's ineligibility for a merit increase and the termination of his employment. *See Fuentes v. Perski*e, 32 F.3d 759, 764 (3d Cir. 1994).

After a careful review of the summary judgment evidentiary record, the Court finds and rules that Plaintiff has not contradicted or otherwise controverted Mellon's reasons for its refusal to award him a merit increase and/or to terminate his employment.

The record is undisputed that pursuant to Mellon's Managing Performance and Conduct Through Corrective Action Policy, Plaintiff's supervisors determined that he was not eligible for a salary increase in June 2005 because he was on Final Written Warning status (as a result of his violation of Mellon's Sexual and Other Discriminatory Harassment Policy.) (Facts ¶¶ 50-51). Likewise, the record is undisputed that Plaintiff, after having been warned that he could be terminated for sleeping on the job, ignored the warning, and was found sleeping on the job the very next day. (Facts ¶¶ 66-67, 74-77). Moreover, Plaintiff has not adduced any evidence that Mellon has given inconsistent or contradictory explanations for its refusal to either increase Plaintiff's salary or to terminate his employment.

The record is clear that a violation of Mellon's Sexual and Other Discriminatory Harassment Policy and sleeping on the job are <u>both</u> considered "so intolerable that the usual

progressive discipline may not be followed, and it may be accelerated to a final warning <u>or termination</u>." Mellon Corporate Policies & Procedures Manual (emphasis added).

Further, the record evidence is clear that Mellon was not aware of Plaintiff's contact with the EEOC until <u>after</u> Plaintiff's supervisor told him that he could be terminated for sleeping on the job and Plaintiff then told his supervisor that he had contacted the EEOC. (Facts ¶ 70.)

For all the foregoing reasons, the Court finds that Mellon  is entitled to summary judgment because Plaintiff has not produced adequate evidence from which a reasonable factfinder could conclude that Defendant's legitimate, non-retaliatory business reason for not giving Plaintiff a merit raise and/or for terminating Plaintiff's employment were a pretext or that its real motivation was a retaliatory animus based on Plaintiff engaging in protected activity.

## CONCLUSION

Overall, aside from his mere speculation and conclusory allegations, Plaintiff has not provided any competent evidence that could lead a reasonable fact finder to believe that religious discrimination and/or retaliation were factors in the treatment he received from Mellon.  Because Plaintiff's opposition filing does little more than re-allege the factually unsupported allegations contained in his pleadings, Plaintiff has not established the existence of a genuine issue of material fact that would defeat Defendant's motion for summary judgment on his claims of unlawful discrimination and retaliation brought under Title VII and the PHRA.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that (i) Plaintiff has failed to establish a *prima facie* case of religious discrimination; (ii) Plaintiff has failed to establish a *prima facie* case of retaliation; and (iii) Plaintiff has failed to establish sufficient evidence from which a reasonable fact finder could rationally find that Mellon's articulated reasons for its employment actions were unworthy of credence, or that the decision to issue Plaintiff a disciplinary warning and deny him a wage increase and/or to terminate his employment was motivated by a discriminatory reason. Where a plaintiff cannot show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in defendant's reasons for its action, summary judgment is required. *See Fuentes,* 32 F.3d at 756. Accordingly, summary judgment will be granted as to Plaintiff's claims of religious discrimination and retaliation.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ALBERT (AVRAHAM) SCHWARTZBERG,  )
                                            )
                   Plaintiff,         )
                                            )
                   v.               )      02: 06cv1006
                                            )
MELLON BANK, N.A.,                 )
                                            )
                   Defendant.     )

## ORDER OF COURT

     AND NOW, this 8th day of January, 2008, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

     1.     The Motion for Summary Judgment filed by Defendant is **GRANTED** as to

all claims of alleged unlawful discrimination and retaliation in violation of Title VII of the Civil

Rights Act of 1964 and the Pennsylvania Human Relations Act;

     2.     The Motion for Partial Summary Judgment filed by Plaintiff is **DENIED;** and

     3.     The Clerk shall docket this case closed.


                                    BY THE COURT:


                                    s/Terrence F. McVerry
                                    United States District Court Judge

cc:      Charles H. Saul, Esquire
Margolis Edelstein
Email: csaul@margolisedelstein.com

Kyle T. McGee, Esquire
Margolis Edelstein
Email: kmcgee@margolisedelstein.com

Liberty J. Weyandt, Esquire
Margolis Edelstein
Email: lweyandt@margolisedelstein.com

Cathy Bissoon, Esquire
Cohen & Grigsby, PC
Email: cbissoon@cohenlaw.com